E. Harold Wineland, State's Attorney, ex rel. William Abeln et al., Appellee, v. M. Huber, Inc. et al., Appellants.

Opinion filed June 4, 1934.

C. E. FEIRICH and H. D. McCOLLUM, for appellant Southern Illinois & Kentucky R. Co.; E. C. CRAIG and V. W. FOSTER, of counsel.

JUNE C. SMITH and HUGH V. MURRAY, JR., for appellants M. Huber, Inc. et al.

E. HAROLD WINELAND, for appellee.

MR. JUSTICE STONE delivered the opinion of the court.

On the 15th day of November, 1933, appellees filed in the circuit court of Clay county their bill in chancery, alleging that M. Huber, Inc., a corporation, with main offices in the City of Chicago, purchased, on May 1, 1930, a tract of land in Larkinsburg township, Clay county, Illinois, containing about 160 acres— describing the tract; that said tract lies along both sides of the Southern Illinois and Kentucky Railroad at a point where Dismal Creek is crossed by said railroad and that said tract is and has been under control of M. Huber, Inc. Said bill further alleges that all the relators, who are appellees, here reside within a radius of two and one-half miles of the point where said Dismal Creek is crossed by said railroad; that some of the premises owned by relators adjoin said Huber tract; that subsequent to May 1, 1930, the said M. Huber, Inc., commenced an unlawful use of said

tract of land in such a way as to hinder, prejudice and damage relators in an irreparable manner—that is to say, appellants caused huge amounts of garbage, rubbish, trash, junk and decomposed vegetable and animal matter, animal and vegetable matter in the stage of decomposition from outside of said county, as petitioners believe from the City of Chicago, to be carried and transported to the tract of land in question and deposited thereon; that said rubbish, garbage, etc., was carried and transported to said tract over the Southern Illinois and Kentucky Railroad; that the defendant, M. Huber, Inc., owned and controlled two steam shovels with which said garbage and rubbish was dumped upon said tract of land and leveled thereon; that said rubbish and garbage was brought and distributed to said tract in innumerable quantities at different times and dates and now covers a considerable portion of the landscape upon the said tract of land; that the said rubbish and garbage, etc., is composed of all kinds of decomposed and decomposing vegetable and animal matter; that the carcasses of dogs, cats and other animals, tin cans, boots, rags and broken glass have been dumped there; that certain of the defendants are now in the employ of the said M. Huber, Inc., and have assisted in the disposing of the said rubbish and garbage upon said tract; that subsequent to the bringing of the said rubbish and garbage to the said tract it would be left to dry and burned by certain of the parties defendant.

That said tract has become a place for the congregation of undesirable persons of low and vicious instincts and habits, some of whom have continued to dwell upon said tract and whose means of existence is foraging and scavenging of the said rubbish and garbage, etc.; that violations of law have resulted therefrom and that on the 24th day of June, 1932, one William Burgiss, alias Getz, was murdered upon said tract by one Claude

Sapp. At the time of the said murder the parties
thereto were residing upon said tract with the knowl-
edge of the said M. Huber, Inc.; that persons so forag-
ing and scavenging upon the rubbish, garbage, etc.,
have disturbed the peace of the neighborhood and used
lewd, obscene and blasphemous language to the hin-
drance and prejudice of the relators and their families.

That the rubbish and garbage aforesaid, since being
deposited upon the said tract, has had numerous rains
fall upon it which have caused minute portions of the
rubbish, garbage, etc., to drain into Dismal Creek
which runs along a point adjacent to the said rubbish,
garbage, etc., and that said Dismal Creek as a result
thereof has become polluted and poisoned to the dam-
age, hindrance and prejudice of the relators and other
landowners and occupants through whose land the said
Dismal Creek runs; that the stench and filthy odors
arising from the said garbage and rubbish, etc., has
become unbearable to relators and other adjacent land-
owners and occupants; that said stench and odors
have affected and impaired the health of relators and
their families and the health and well-being of domestic
animals owned and possessed by relators; that the
smoke arising from the burning of said garbage,
rubbish, etc., has descended upon the plants and veg-
etables of relators to the damage, prejudice and hin-
drance of relators; that an uncommon species of rat
has infested the pile of rubbish, garbage, etc., and that
said rats infest the barns and dwelling of relators and
destroy the chickens and other fowls belonging to re-
lators; that as a result of said garbage, rubbish, etc.,
being piled upon the said tract of land, innumerable
flies and insects have collected and are infesting said
tract and the homes of relators to the damage, prej-
udice and hindrance of relators; that the said M.
Huber, Inc., has often been requested to discontinue
transporting and dumping of said garbage, rubbish,

etc., upon said tract but he has refused to do so. That the said defendant, M. Huber, Inc., has wholly disregarded the rights of relators and that one of its employees told one of the relators in disrespectful language that it was none of relator's affairs as to what was done on said tract and further said to him that "if we feel like building a mountain of garbage on your land you hicks have got to like it."

That for over a period of a year defendants have not carried garbage or other filthy material upon said tract and that by reason thereof the nauseating condition of the said rubbish, garbage, etc., already deposited there has become somewhat alleviated and the odors and stench and insects are not so distinct and pronounced as they were when the garbage, rubbish, etc., was deposited on said tract. However, petitioner is informed and believes that said M. Huber, Inc., intends to and will commence the dumping of more garbage, rubbish, etc., upon said tract of land on, to wit, Thursday, November 16, 1933; that your relators will thereby be without adequate remedy unless said defendants are restrained from carrying and dumping any more rubbish, garbage, etc., upon said tract of land; that the injury to the public health and safety of relators will be irreparable unless the dumping as aforesaid is restrained.

Said bill further alleges that as a result of said dumping of rubbish and garbage, etc., the value of the premises of relators has depreciated exceedingly and if the threatened grievance is permitted to continue to exist, said premises will still further depreciate in value and that the relators will be compelled to abandon the use of said premises as abodes for themselves and families.

A prayer for injunction to restrain further acts of depositing refuse upon said tract was made a part of said bill.

Said bill with its accompanying affidavits was presented on the same day to Hon. Wm. B. Wright, one of the judges of said court, who granted a temporary injunction in accordance with the prayer therein, without notice and without bond. The order for injunction is that appellants, their attorneys, officers, agents and servants be restrained from dumping, carrying upon, placing in such a way that it might be dumped upon, discharging or depositing any garbage, rubbish, filth, refuse or any material from any source on the tract of land in question, or from bringing in or causing to be brought in, until the further order of the court, to the said county for the purpose of depositing or discharging upon the said tract of land, any rubbish, garbage, filth or refuse of any kind or from any source. The writ of injunction follows the order.

On December 9, appellants filed their answers to the bill. In said answers, appellants M. Huber, Inc., Basil Cantrall, Jack Nichols, Frank Springer and Dick Singer admit the ownership of the real estate described in the bill and the control thereof. Further answering said appellants denied all the material allegations of said bill, and in addition thereto alleged as defenses that in the year 1929, the said M. Huber, Inc., entered into a contract with the City of Chicago to dispose of street sweepings and other rubbish accumulated and collected in the said city, consisting of tin cans, old shoes, boots, rags, paper, broken glass and other non-putrescible matter; that for the purpose of disposing of said rubbish the said M. Huber, Inc., purchased the tract of land in question; that said tract is located in a sparsely settled portion of Clay county in a community where there are few inhabitants and at a great distance from the dwelling houses and other buildings of the inhabitants of the community, which community is grown up with scrubby timber, brush and other vegetation; that in order to handle and dispose of said

rubbish it was necessary for the defendant, M. Huber, Inc., to, and it did construct a plant for the loading and handling of the same in the City of Chicago, representing an investment of approximately $100,000; that said rubbish was collected by said city and delivered to the plant of the said defendant, M. Huber, Inc., therein where defendants loaded same on railroad coal cars and transported it to the said tract of land where it was unloaded in a deep depression or ravine far from the habitation of any of the relators; that in order to handle the disposition of such rubbish the said M. Huber, Inc., has invested a large amount of money at the point where said rubbish is unloaded, for the construction of railroad sidetracks and other equipment which is maintained by said M. Huber, Inc., at great expense; that in order to unload said rubbish on the real estate in question, the said M. Huber, Inc., employs a large number of men and the handling of said rubbish affords work and employment to a large number of the citizens of said community who would not otherwise be employed; that the operation of the dump thereby furnishes a substantial pay roll and livelihood for a large number of individuals residing in that community; that up to the time of the serving of the injunction the said M. Huber, Inc., had transported and unloaded at said dump approximately 12,000 carloads of rubbish and that it averages 28 cars per week, which furnishes regular and continuous employment to a large number of employees of said railroad, who would not otherwise be employed; that in handling and transporting such rubbish the railroad company uses open coal cars which have been transported to Chicago and to other points in the Middle West loaded with coal and these empty cars are then loaded with the rubbish which is transported to said dump, thus enabling the railroad company to secure revenue in the movement of said cars both ways from southern Illinois coal fields to the City of Chicago, and elsewhere.

That the people upon said dump are poor and without property or other means of support and for the purpose of enabling them to gain a livelihood and not become public charges or objects of charity the defendant, M. Huber, Inc., has permitted them to reside on said tract of land in the vicinity of said timber and to ply their vocation of salvaging from said rubbish, rags, scrap iron, glass and other salable material, by which they have been able to earn a living.

Further answering, defendants say that rubbish of the same kind and character has been used extensively for filling quarries and depressions in thickly populated localities and has not caused inconvenience to the inhabitants who reside within the vicinity where the same has been dumped; that similar rubbish has been dumped for many years in certain depressions in the thickly populated residential sections of the City of Chicago; that 5,000 carloads of rubbish of the same composition was used to fill an abandoned quarry in the thickly populated residential section of the City of Kankakee and that same caused no disagreeable odors or other disadvantages to the citizens residing in the immediate community.

That the dump or point where said rubbish is dumped is practically in the center of said tract of land so that it is far removed from the land and property of others; that in the year 1929, the character of rubbish deposited on said dump was investigated by the Department of Health of the State of Illinois and that said department determined that said dump did not create or cause a nuisance.

Defendants further allege that the action in this case was not brought in good faith and not on account of the evil effects complained of but because of some imaginary private grievance which relators have against the defendant, M. Huber, Inc., because they have been refused permission to pick rags on said dump or have been unable to obtain employment with

the said M. Huber, Inc.; that a number of said relators have from time to time worked for the said M. Huber, Inc., on said dump and during said time made no complaint of any offensive odors or conditions arising therefrom; that other of said relators have sought to induce the said M. Huber, Inc., to give them the exclusive privilege of picking rags and other salvage from said dump and to exclude all other persons from so doing and upon being unable to make such arrangements have set upon the unfounded claim that said dump is offensive; that the said complaints of said relators are imaginary grievances and not an account of any offensive odors or other disagreeable conditions existing in the neighborhood; that the said M. Huber, Inc., maintains a substantial pay roll and pays out same in wages to the residents of said community, most of which is paid to people who would not otherwise be able to earn a livelihood.

That the damages through the improvident issuance of said injunction without bond and without notice, have resulted not only to defendants but to the community at large, because it has prevented various citizens of said community from following their employment.

The answer of the appellant, Southern Illinois and Kentucky Railroad Company, a corporation, admits and denies substantially the same allegations of the bill as are admitted and denied by the answer of the other appellants. In addition, this appellant describes its connection with the Illinois Central Railroad Company and alleges the magnitude of the Huber contract and its value to said Illinois Central Railroad Company.

With their answers appellants filed a motion to dissolve the temporary injunction alleging that there is no equity on the face of the bill; that the material allegations of said bill are denied by their answers and

affidavits filed therewith and will be further denied upon hearing of said motion; that it appears from said bill and the affidavits filed in connection therewith that the injunction was improvidently and improperly issued, because no sufficient or proper affidavits were filed, entitling appellees to the issuance of a temporary injunction without notice.; that it appears from said bill of complaint and the affidavits filed therewith that it was improper to grant an injunction thereon without bond.

A cross motion was made by appellees to strike from the files appellants' motion to dissolve and also their answers, notices etc. This motion was denied. No cross error is assigned on this ruling.

On the hearing of said cause, the court modified the decree thereby enjoining and restraining appellees from dumping upon the said tract of land any separated or unseparated garbage or carcass or any dead matter of any other decomposed or putrescible animal or vegetable matter therefrom, or cans or containers filled or partly filled with like animal or vegetable matter or any putrescible or decomposed matter derived therefrom, or from bringing into Clay county from any source for the purpose of dumping upon said tract any separated or unseparated garbage or carcass of any dead animal, or any decomposed or putrescible animal or vegetable matter or any putrescible or decomposed matter derived therefrom, and from dumping any filthy matter whatever, including putrescible animal or vegetable matter or any putrescible or decomposed matter derived therefrom, within 300 yards of the channel of said Dismal Creek. Thereafter, the trial court denied the motion to dissolve. From this interlocutory order denying said motion appellants have appealed to this court, assigning as errors that the court erred in denying the motion, in refusing to sustain said mo-

tion, in continuing the injunction in effect as modified, in the admission and exclusion of evidence; that the order was contrary to the evidence in the case, that it appears from the face of the bill that it is not a suit to abate a public nuisance but is a suit of a private nature and the complainant as State's attorney cannot maintain such suit; that said injunction was improvident and improperly granted without notice and without bond.

A motion to stay the proceeding pending this appeal was filed in this court and was taken with case.

Appellees raise two questions which must be disposed of before consideration of the merits of this case. (1) Should this appeal be brought, if, indeed, it may be brought at all, under sec. 123 of the Practice Act of 1907, Cahill's St. 1931, ch. 110, ¶ 122? Or should it be brought under sec. 78 of the Civil Practice Act, Cahill's St. 1933, ch. 110, ¶ 206? Were there ground for holding that this appeal should be presented under the old act, we should have to dismiss it as we are convinced that the weight of authority is to the effect that appeals from interlocutory orders denying motions to dissolve injunctions were not appealable under that act. It seems quite clear, however, from Rule 1 adopted by our Supreme Court at its December Term, 1933, in pursuance of the Civil Practice Act that any order entered after January 1, 1934, if appealable at all, is appealable under the provisions of the Civil Practice Act—excepting of course such matters as are without the scope of said act. The order in this case from which the appeal was taken was entered after the latter date and therefore, if appealable, was appealable under the new act, although the case was brought and in large measure tried before the new act became effective.

The second question is, is the order under examination an appealable order within the purview of sec. 78

of the Civil Practice Act? That section provides: "Whenever an interlocutory order or decree is entered granting an injunction, or overruling a motion to dissolve the same, or enlarging the scope of an injunction order, . . . an appeal may be taken therefrom to the Appellate Court." Cahill's St. 1933, ch. 110, ¶ 206.

The language of this section seems broad enough to include any and all orders denying motions to dissolve, whether they be entered by a judge in vacation or by a court in term time. Substantially the same language is used in section 123 of the Act of 1907. That section, however, was taken from the Act of June 14, 1887, which was enacted under the title: "An act to Provide for Appeals from interlocutory Orders, granting Injunctions or appointing Receivers." It is obvious, that although the language of the section is broad enough to include such appeals, it is too broad for its title. This is the theory of the cases, cited by appellee, to the effect that such appeals as this do not lie. Section 78 of the Civil Practice Act is not open to this objection—it having been enacted under the title "An act in relation to practice and procedure in Courts of Record." By virtue of the latter section the law now is that appeals lie from interlocutory orders refusing to dissolve injunctions, whereas they did not, formerly. This section also, in our judgment, includes all such orders whether made by a judge or by a court.

Appellants contend that there is that substantial conflict in the evidence which requires appellees to establish their rights at law before they are entitled to an injunction; also that leaving in effect this injunction will occasion greater injuries to defendants than will be occasioned to complainants by dissolving it. They also invoke the doctrine of laches. Appellees contend that the injuries set out in their bill are irreparable; that those injuries involve loss of health, destruction of the means of subsistence, permanent

ruin to property, the breathing of foul air, the ruin of natural watercourses, other invasions of public rights and the destruction of the ordinary physical comforts of ordinary persons.

Comment on some of the cases cited may furnish a proper background for the consideration of this case.

The case of *Robb v. Village of LaGrange,* 158 Ill. 21, cited by appellants merely holds that in that particular case, the evidence was not sufficient to constitute a nuisance and would not be so regarded unless there was an adjudication at law that the place was a nuisance. This case does not decide the general principle as appellants have argued. In addition this case refers to two other cases, viz., *Dierks v. Commissioner of Highways,* 142 Ill. 197, and *Village of Dwight v. Hayes,* 150 Ill. 273, citation in each of which our Supreme Court held that the discharge of sewage of a village into a stream of water running through complainants' land was a nuisance and that the landowner was entitled to an injunction to abate it in the first instance.

The case of *Sutton v. Findlay Cemetery Ass'n,* 270 Ill. 10, is not in harmony with the application sought to be made of it. In that case the court among other things said, "Defendant insists that as a cemetery is not a nuisance *per se* but may or may not be a nuisance, according to circumstances, its character as such should have been first established by a judgment in an action at law before a court of equity would interfere, by injunction, to restrain or abate it. That this was formerly the rule, is undoubtedly true, but that rule has in more modern times not been strictly adhered to." In this case an injunction was approved, enjoining the pollution of a stream although there was a dispute on the main facts in evidence. To the same effect is *Barrett v. Mt. Greenwood Cemetery Ass'n,* 159 Ill. 385.

In the case of *City of Pana v. Central Washed Coal Co.,* 260 Ill. 111, it was held that the circumstances of the case were such that a mandatory injunction should not issue to abate an alleged nuisance which meant the destruction of long established valuable property rights without there being first an adjudication at law of the question of nuisance. There the cases on both sides of this question are collected and numerically are somewhat equally balanced. The principles of these cases are not in conflict. The sure authority to be derived from their consideration is that each case must be governed by its own facts and circumstances. The chancellor is the arbiter of these facts and circumstances and if he is convinced upon hearing that a nuisance either exists or does not exist, his opinion is entitled to great weight and it ought not be disturbed unless an Appellate Court can readily see that he has acted contrary to the weight of evidence or in conflict with established rules of law. We do not find authority in the *City of Pana* case, *supra,* which requires that in cases of this character in every conflict of evidence a judgment at law is a condition precedent to the intervention of a court of equity. Furthermore the *City of Pana* case was a mandatory injunction case in which it was sought to compel the defendant company to remove a pile of slack which was the accumulation of many years. There is substantial difference between enjoining a continuing nuisance and compelling the performance of affirmative acts in reference to property rights long acquiesced in, the change of which involves prodigious tasks and large expenses.

We have analyzed the above authorities not so much for the purpose of arguing against the principles sought to be applied to the case at bar as to expose the line of demarcation between those cases which hold that a judgment is a prerequisite to an injunc-

tion and those which hold that injunction is proper in the first instance. We think that line is not indistinct. It is bounded on one side by those cases in which the facts are so in dispute and in which the evidence is so conflicting that a court cannot without difficulty determine whether the right exists and on the other by those cases in which a court can readily see that the right exists and that the remedy of injunction should be employed. There is a wealth of illustration of these boundary lines to be found in the decisions of our courts. As said before many of them have been collected and commented upon in the *City of Pana* case, *supra*. We believe there would be little or no question in the minds of the parties to this suit of the soundness of the principles of these cases, as they have been applied. Indeed, the same is true as to the cases here cited by the respective parties. It follows that our sole concern is which of these classes of authorities applies to the facts in the record before us. We need not look further. All questions involved in this case have been passed upon by the authorities submitted. We have but to make the proper application.

The evidence of appellees tends to show that since 1929, appellants have dumped approximately 12,000 cars of rubbish upon the tract of land in question; that the material so dumped is of great variety, consisting of trash of all kinds, animal and vegetable matter, dead dogs, dead goats, cats, rats, and other putrescent matter; that said dump has attracted a peculiar species of rats; that said rats have spread to the surrounding community and have preyed upon the poultry of the residents; that said dump has attracted many rough characters who indulge in lewd, coarse and unlawful conduct to the annoyance of the neighborhood; that fires are burned upon the dump and the smoke therefrom settles over the neighborhood destroying vege-

tation and rendering the lives of citizens miserable by polluting the air which they breathe; that the stench and foul odors arising from the dump are sickening and can be smelled for miles around; that families have become sick from breathing the air; that people in the vicinity have to keep their houses closed on hot summer nights to escape the effects of the odor from the dump; that the conditions there are ideal for the spread of germs which affect animal life, such as hemorrhagic septicemia, influenza, trichinae, anthrax and black leg; that the waters of Dismal Creek which runs through the premises and empties into the Little Wabash River are poisoned and polluted so as to render them unusable and to be destructive to animal life; that flies and insects gather in immense quantities about the place to the annoyance of the neighborhood.

If these things are true this dump amounts to a public nuisance of a dangerous, not to say a deadly, character. It renders homes uncomfortable and families miserable. It takes from them the natural, God-given rights of breathing pure air and using pure water. Conduct of the character here described is in direct violation of Cahill's St. ch. 19, ¶ 72; section 61 of chapter 19 of Smith-Hurd statute against the pollution of streams. Damages of this character cannot be compensated in money. No remedy at law is adequate. Neither can property rights be set off against these inherent and inalienable rights. It would be a vicious doctrine, indeed, that would permit a party to say, ''We have rendered your homes useless and your lives miserable, but we have our money invested in our industry and our property rights must not be disturbed.'' Furthermore, we are unable to accept the argument that these people, having endured the things which they claim in this record as long as they had, and then being somewhat relieved by the cessation,

are not in a position to complain when they are threatened with the resumption of the conduct which first brought about their misery. There is only one question involved here: "Does this evidence, considered in the light of the evidence of appellants as to the nature and character of their industry, warrant this injunction?"

To meet the evidence of appellees, appellants offered a number of affidavits to be found on pages 30–40 of the abstract to the effect that the affiants resided in the neighborhood, some of them with their farms adjoining the dump tract; that they had not been adversely affected by the odors from the dump or the pollution of the waters of Dismal Creek. Much of this evidence is in the nature of conclusions of the various witnesses. Some of them admit that there are odors from the dump. Some of them have some interest in the outcome of the case. Appellants also offered oral testimony of a number of witnesses, among them Melvin A. Dobbs, who is employed by the Illinois Water Survey. He visited the premises and made an inspection in 1929 and found none of the things complained of in the bill. The dump necessarily was new at that time. Since 1929 the company has dumped 12,000 carloads of material there. An inspection in 1929 would not be very convincing of the condition of the dump since that time. Neither would the testimony of the witness, Fred W. Farmer, who examined the cars of rubbish on the tracks of the Illinois Central at Champaign. It is quite possible that appellants were hauling to the dump the matter complained of and still there would be none of it in the cars he examined. Most of these witnesses are employed by the Illinois Central Railroad Company which has a direct interest in the outcome of this case. They testify that they never observed offensive odors from the dump in question. Their testimony

must be considered in the light of their employment by said railroad company. John J. Balger is manager for the chief defendant. M. Huber is at the head of the chief defendant. R. O. Singer is a defendant. Gus W. Barnhart was employed by the Huber Company. Henry Gilmore is a junk dealer and derives benefit from the dump.

There is substantially no contradiction of the evidence, that the waters of Dismal Creek are contaminated by the dump. Neither is there serious conflict on the question of animal and vegetable matter being upon the dump among the persons who live near. There is conflict from the testimony of defendants then agents, servants, etc. We do not mean to decry the testimony of these people but under the rules of evidence we must take into consideration their interest in this suit.

That this dump is a rat breeding place and that the neighbors have suffered from that fact is practically uncontroverted. Theories, statements on information and belief and the "not that I know of" character of testimony do not weigh against positive statements of known matters of fact. Statements like that of Mr. Mulhouse and Mr. Boyer that their families have been made sick by the odors from this dump are not contradicted by the statements of others that they were never made sick by them.

Much is in appellants' evidence as to the damages accruing to the community by the loss of employment to its citizens on the dump. While we regard this as most unfortunate we cannot balance that loss against the destruction of the unquestionable rights of the citizens of the community to have their homes, comfort and health unimpaired by unlawful conditions which destroy them.

Much is said about the scope of this injunction. It must necessarily be broad and decisive if it is not to

invite a multiplicity of lawsuits to determine whether it is being obeyed. Moreover, there would have been no need for any injunction, had appellants applied their common knowledge of what might have been dumped upon their own premises and what might not have. No resort to the knowledge of the law on injunction is necessary to determine that fact. That one may not use his premises so as to destroy the natural rights of his neighbors is as old as law itself.

Taking this record in its entirety, giving due consideration to the very able manner in which counsel for appellants have argued their case, we are constrained to the opinion that the injunction in this case is fully warranted and that the trial court did not err in denying the motion to dissolve it.

*Affirmed.*