**Edward H. Gardner et al., Appellees, v. International Shoe Company, Appellant.**

Opinion filed June 1, 1943.

CHAPMAN & THOMAS, of Alton, RICHARD O. RUMER, of St. Louis, Mo., CHARLES E. RENDLEN, of Hannibal, Mo. and BAKER, LESEMANN, KAGY & WAGNER, of East St. Louis, for appellant.

MANUEL M. WISEMAN, PHILIP G. LISTEMAN and RALPH D. WALKER, all of East St. Louis, for appellees.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This is an appeal from eight judgments of $1,200 each and one judgment of $1,000 entered in the same case by the circuit court of Madison county, in favor of the plaintiffs in the trial court and against the International Shoe Company, appellant. The suit was brought jointly by eight husbands and wives and one individual to recover damages, charging appellant, who will be hereinafter referred to as defendant, with improper conduct in the operation of its tannery and a settling basin used in connection therewith, in the village of Hartford, Illinois, and alleging that as a

result of such alleged improper conduct, the defendant necessarily caused odors which interfered with the plaintiffs' use, occupation, and wholesome enjoyment of their respective homes, and caused plaintiffs substantial damages peculiar to them.

The complaint consisted of nine counts, all of which were identical with the exception of names, description of property owned by the respective plaintiffs, and like matters. Each count alleged that the defendant, in the operation of its tannery, maintained a certain open sewage pond and that waste materials and chemicals used in the tannery, as well as raw sewage from the cafeteria and toilets were emptied into said pond and thereafter carried into the Mississippi river. It was further alleged that in the process of operation of said sewage pond by defendant, large quantities of chemicals, gases, odors, fumes and other unwholesome, noisome, unclean and irritating matters were emitted into the air from said pond and pervaded the air around plaintiffs' residences, and because of this, plaintiffs' use, occupation and wholesome and healthful enjoyment of their homes had been disturbed and denied them.

Defendant's answer admitted operation of the tannery, and the control and maintenance of the pond into which waste materials containing some chemicals and some sewage was discharged, but averred that the cafeteria and toilet sewage comprised less than 5 per cent of the effluent drained into the pond and that 95 per cent thereof was water used to wash hides from which foreign substances had been removed; that the pond was necessary to the operation of the tannery, and denied that large quantities of gases, odors, fumes and other unwholesome matters were emitted into the air from the pond. The answer further alleged that the community where plaintiffs resided was an industrial community-containing other plants and factories, all of which emitted odors.

Amendment was made to the complaints charging that defendant maintained a pond which constituted a public nuisance and the odors from which interfered with the wholesome use of plaintiffs' premises.

Upon a trial of the issues before a jury, nine verdicts were returned finding defendant guilty and assessing the damages of the plaintiffs in each of the counts at $1,800. The trial court required a remittitur as to each verdict in the sum of $600, except as to the verdict in favor of plaintiffs Ralph and Pauline McReynolds, as to which latter verdict, it required a remittitur of $800. Motion for new trial was overruled, and the court entered judgment in favor of the plaintiffs named in each count in the sum of $1,200, except as to plaintiffs Ralph and Pauline McReynolds for whom judgment was entered in the sum of $1,000, from which judgments, defendant prosecutes its appeal to this court.

It is relied upon as error for the reversal of these judgments, that plaintiffs failed to plead or prove any cause of action at law which would entitle them to a judgment for damages against defendant. It is also contended on behalf of defendant that, because the evidence did not show any damage from the odor to the health of plaintiffs, and because of the fact that no smoke, soot, hides, hair or any substance of any kind was cast upon plaintiffs' premises, no action for damages can lie. It is also strenuously urged in that regard that private actions at law may not be maintained by a citizen against a person or corporation for the maintenance of a public nuisance unless he has shown personal damage peculiar to himself which is different from that suffered by the general public.

The village of Hartford, in which plaintiffs and witnesses live, has a population of about 1,600 people, and is situated in the very heart of a great industrial area which extends for many miles along the east bank of the Mississippi river and opposite the metropolis of St. Louis, Missouri. In and near the village were a

large number of oil refineries, lead works, and a fertilizer plant, numerous pig pens and outdoor toilets. In close proximity to the village is a Standard Oil Company refinery, the Wood River Oil and Refinery Company, a fertilizer plant, the White Star Refinery property, and also railroad tracks used extensively by the Alton, the Big Four, the Illinois Terminal, and the Litchfield and Madison.

The defendant has operated its tannery business within the city limits of Hartford for more than 24 years. During 1938–1940, it employed 850 to 900 persons, and was engaged in tanning cattle hides and preparing leather for use in the upper portion of shoes. In the tanning process between 1,225,000 and 1,305,000 gallons of water are used daily in washing, soaking, and treating the "green salted" cattle hides which have been cured with salt for a period of about 30 days after the hides have been removed from the animal and before they are received at the defendant's tannery.

The hides are washed approximately eight times. The first washing takes off the loose dirt that may be hanging on the hides plus the salt that they contain. The next operation is what is called "soaking" and is done in clear water, and removes practically nothing from the hide, but is for the purpose of wetting the hide. The third washing is a chemical treatment which has for its purpose the loosening of the hair. The fourth washing has for its purpose the dissolving of the lime which the hides have absorbed. The fifth washing is to remove the remainder of the lime, and the sixth is a treatment in a solution of salt and sulphuric acid in the tanning process. The seventh treatment is with a chemical known as basic chromium sulphate and salt which tans the hide. The next operation has two parts, one of which is the retanning of the hide with chromium sulphate and salt and then an

operation in which the stock is dyed and in which oils and fats are introduced.

Tests made by the Illinois department of Health showed that of the daily discharge of approximately 1,300,000 gallons of waste, there was approximately 9,480 pounds of suspended solid matter, most of which was finely divided, it having passed through a large self-cleaning rotary screen with a $\frac{3}{16}$ to $\frac{1}{4}$ inch mesh.

Until 1938 this effluvia or waste material was discharged into the Mississippi river. In 1936, the Illinois Department of Health made a study of the industrial waste problem in the Hartford–Wood-River industrial district. They found that the solids contained in the industrial waste of these industries and others interfered with the water supply of the cities along the Mississippi river to the south of Hartford. This study included a survey as to the volume and content of the wastes of the International Shoe Company tannery. As a direct result of this survey, the Sanitary Water Board of the State of Illinois required the International Shoe Company, as one of the industries contributing to the Hartford–Wood-River industrial waste problem, to dispose of its waste in some manner for the purpose of removing the solids therefrom before passing the water into the Mississippi river.

The defendant, pursuant to the above order constructed a settling tank or basin about 1,200 feet long, 275 feet wide and 5 feet deep. This reservoir was constructed and located under the direction of the Illinois State Department of Health. It was built to meet their requirements after they had made an extensive study and comprehensive survey of the problem.

It also appears from the evidence that in addition to the waste passing into the settling tanks from the tannery, there was the passage of human waste from

the toilets of the tannery and from a few small homes near by. Mr. Black, the senior sanitary engineer of the Illinois Department of Health, testified from actual tests made by him that only about 50 pounds of solid fecal matter was discharged into this basin per day, and at the same time there accompanied this flow, some 10,000,000 pounds of water. For every pound of solid fecal matter there was 200,000 pounds of water. It also appears in evidence that the tannery employs large quantities of lime in and about the processing and tanning of hides. It was estimated that there was approximately 5 tons of lime used daily. It is a matter of common knowledge that lime will aid materially in the killing of bacteria, and thus prevent decay and decomposition of solids which settle to the bottom of the tank. The foregoing is a rather comprehensive picture of the physical surroundings that beset the plaintiffs and defendant, at and during the time the controversy between them arose, and which is now presented to us for decision.

Many witnesses testified on the hearing of this cause before the lower court, 17 of which appeared for the plaintiffs and 23 for the defendant. They were all residents of the village, some living near and others farther away from the settling basin.

Plaintiffs' witnesses testified that the odors were offensive to smell, and at times produced nausea and a headache. The extent of the annoyance varied with the weather conditions and with the direction of the wind. Some testified that the odors were always noticeable, others that it was intermittent. Many were of the view that the smells were typical of those that prevailed in the tannery itself. Then there were a few of the plaintiffs that said the odors flowing from the basin in question were "sickening," "like something dead," "foul and vile like some decomposed animal," "worse than decayed and rotten eggs." They further testified that sometimes the fumes were so

vile that it became necessary for some of the plaintiffs to leave home and seek fresh air elsewhere, and further that they suffered considerable embarrassment when having friends call their attention to the smells that this factor made their visits to their homes less frequent. Of the two disinterested witnesses who supported the claims of the plaintiffs, one, Percy Chapman, said, "I don't think it hurt me. I haven't lost any time because of it." The other, Connie Johnson, said, "The odor didn't bother me except it wasn't pleasant."

On behalf of the defendant, there appeared 23 witnesses most of whom were disinterested with the exception of those who were either employed by or had relatives working for the defendant company. It appears from the testimony of these witnesses that there were unpleasant odors arising occasionally from the settling basin in question. The extent of such varied with the breezes and humidity. These witnesses all agreed that they were not bothered thereby; that the smells were noticeable to the point of being disagreeable not more than 8 or 10 times a year; that the smells and odors were comparable to those found in a tannery. There was evidence that there is a public school situated within one and one-half blocks of the basin, which distance was closer than any of the plaintiffs. Orville O. Brunjas, the principal of the school, and Myrtle Fisher, the school nurse for this school, both testified that the odors emanating from the basin were unpleasant and noticeable at the school not more than 8 to 12 times during a school year; that such did not interfere with the conduct of the school, nor had school authorities experienced any difficulties on account of sickness of pupils. It would appear that Mr. Brunjas and Miss Fisher were both entirely disinterested, and from their testimony, the court arrives at a pretty accurate picture of what the true situation has been in the village of Hartford with reference to disagree-

able and unpleasant odors coming from the effluvia deposited in defendant's basin.

Mr. Gardner, who appears to be one of the champions of the rights of the plaintiffs, admits that he had erected, 2 years after the genesis of the basin, a new residence on the same lot where his home is situated. Into this new domicile, he moved his father-in-law, mother-in-law, his mother-in-law's half brother and wife and two children to enjoy the constantly nauseating odors coming from the defendant's "Rose Bowl." We wonder if this is the proverbial treatment of "in-laws." Mrs. Gardner said her husband became sick at his stomach frequently, had an extremely delicate and sensitive stomach, but he never missed a meal.

The testimony showed that there are no vacant properties in the village of Hartford, and that new homes have been erected since the defendant's new scheme of waste disposal went into effect. It further appeared from defense witnesses that there were many pig pens and open toilets near the homes of several of the plaintiffs; that plaintiff, Morris L. Schupback sold his home and a house adjoining it to Mrs. Haley in August 1940; that Mrs. Haley testified that she continues to live in the premises, suffering no discomfort whatsoever; and that Ralph McReynolds, a plaintiff, bought his home and moved into it 6 months after the inception of the basin, when odors, if especially objectionable, would have been well known to him. The proof further revealed conclusively that the odors were not dangerous to life nor harmful to public health; that the activities of the village business, social, and economic life continued on just the same now in Hartford as before the building of the basin.

The defendant on this appeal makes the contention first, that the trial court erred in not having entered judgment notwithstanding the verdict, and second, that in the event such view is not entertained by the court, that the case should be remanded for new trial

because the verdicts were against the manifest weight of the evidence, and there was error in the exclusion of evidence and in the giving and refusing of instructions. If the first contention made by defendant is sustained, it obviously becomes unnecessary to give attention to the second.

To justify recovery, the plaintiffs rely upon a line of cases which appears in their brief under the following: "This court has heretofore settled all substantial questions of law raised in this case," citing *Cook v. City of Du Quoin,* 256 Ill. App. 452; *Wineland ex rel. Abeln v. M. Huber, Inc.,* 275 Ill. App. 264; *Feder v. Perry Coal Co.,* 279 Ill. App. 314; *Eckart v. City of Belleville,* 294 Ill. App. 144.

Let us briefly analyze those cases to determine their applicability here. The *Cook v. City of Du Quoin* case was a suit in equity for an injunction enjoining the defendant from polluting a natural watercourse which flowed through the plaintiff's farm lands and which natural watercourse he had used for watering his stock. The defendant, a city of 10,000 inhabitants, emptied its sewage into this natural watercourse, and by reason of this use of the stream it became contaminated, the water in the stream was filled with sediment and sewage and other deleterious elements which killed the fish and rendered the water unfit for use. The contaminated stream gave off noxious and baneful gases and odors which affected the health of members of the plaintiff's family and made them sick. A decree enjoining the pollution of the natural watercourse and assessing plaintiff's damages at the sum of $1,200 was affirmed by this court.

The next case, *Wineland v. Huber, supra,* was a suit for an injunction brought by the State's Attorney of Clay county, on the relation of a number of farmers through whose farms flowed a natural watercourse known as Dismal Creek. The defendants deposited upon a farm which they owned in a remote and

sparsely inhabited portion of Clay county vast mounds and heaps of garbage, carcasses of dogs and other animals and decomposed and decomposing vegetable and animal matter which they obtained in and hauled from the City of Chicago. The garbage and refuse were deposited on the banks of Dismal Creek, which as a result became polluted and poisoned and the stench and odors from the pile of garbage and carcasses and the polluted creek affected and impaired the health of the relators and their families. Rats of an uncommon species abounded in the pile of rubbish and carcasses and infested the barns and dwellings of the relators. The evidence further showed that the dump was a breeding place of and ideal for the spread of germs injurious to health and affecting human and animal life, such as hemorrhagic septicemia, influenza, trichinae, anthrax and black leg. An injunction granted by the lower court was modified upon a hearing so as to provide that no carcasses or putrescible matter be dumped on the land, and that no refuse be placed within 300 yards of the channel of the creek, and, as modified, was affirmed by this court.

The *Feder v. Perry Coal Company* case was a case where the defendant operated a coal mine out in the country upon land adjacent to plaintiff's farm and maintained on its own land a large dump and pile of refuse, composed of dirt or fire clay, rock, sulphur and slate, with a trace of oil. The slag pile became ignited in 1931 and burned intermittently from June until the latter part of November. The slag pile gave off unhealthful and noxious sulphuric gases and smoke, which came over onto the plaintiff's land, settled upon and killed the crops, grass and other vegetation, killed part of his live stock and poultry, and made plaintiff ill. This court reversed a judgment for the plaintiff and found that there was no evidence on which a finding could be based that the smoke, dust or sediment from the fire was in sufficient quantities to cause the death of plaintiff's hogs, and also for errors in the in-

structions given by the lower court, which ignored the question whether the defendant used due and reasonable diligence in the piling of the slag so that spontaneous combustion would not occur and whether or not it used due care in the extinguishing of the fire, which this court held were issues which should have been considered by the jury.

In the last case, *Eckart v. City of Belleville, supra,* the City of Belleville had for many years overloaded its septic tanks through which passed the sewage of the city, to as much as eight times their capacity, over the objections of the State Department of Public Health, and had negligently allowed the plant to get out of repair, resulting in a leak in the intercepter whereby 150,000 pounds per day of raw, contaminated and untreated sewage was emptied into a natural watercourse known as Richland Creek, which ran through the farms of the plaintiffs about 20 miles south of Belleville. As a result Richland Creek, where it ran through plaintiffs' farms, some 20 miles south of Belleville, was covered with a soapy scum, was full of suspended matter and teemed with sludge deposits and was lined with tubifex worms and fungus growths, which live only in polluted streams. Plaintiffs had been accustomed to use the water from the creek until it became polluted, contaminated and unfit for use. The polluted creek affected the live stock on their farms and constituted an unwholesome and unhealthy condition which this court described as "most shocking." The condition so characterized by the court was wholly unnecessary and unreasonable and was directly caused by the wilful overloading of the sewage disposal plant and the failure to keep the plant in proper repair. A decree requiring the city to abate the condition within 18 months and awarding damages to the farmers was affirmed.

We do not believe any one of these cases is analogous to the case at bar or is helpful in determining the question of liability as presented by the pleadings

and facts in this case. Uniformly, in those cases an industrial community was not involved and they presented conditions that were baneful, unhealthy, noxious, poisonous and destructive of human, animal, and vegetable life. In the instant case, we have nothing more than unpleasant and disagreeable odors, and those only occasionally perhaps sickening to a few who seem to be unduly sensitive or might we say allergic to such smells. These gases come from a tank built under the supervision of the Illinois State Department of Health, and have been produced by a factory that is conducted in an approved and standard manner. It might be recited here that the defendant made an offer of proof on the trial that the defendant tannery was operated according to approved methods and recognized standards; that its method of taking care of the waste was the most prudent, careful, and proper one. The court sustained an objection to the proffered proof. A tannery cannot successfully and reasonably operate without smells that may annoy people any more than a stock yards can operate without producing offensive odors that are frequently very annoying and sickening.

Another case relied upon by the plaintiffs which seems to be more nearly in point, is that of *Wylie v. Elwood,* 134 Ill. 281. We quote from the opinion at page 283: ''This is an action on the case, brought in the Circuit Court of Will County, by the appellee, Elwood, against the appellants, Wylie and Sutherland, and also against the Michigan Central Railroad Company and the Joliet and Northern Indiana Railroad Company, to recover damages sustained by the plaintiff below during the month from June 4 to July 5, 1888, in the use, occupation and enjoyment of his dwelling-house, caused by the erection and operation by the appellants of a large coal-shed adjoining said dwelling-house in the city of Joliet, and the handling herein of large quantities of coal by means of machinery driven by

steam power, whereby intolerable noises were produced, and great quantities of coal dust and dirt were cast upon and into said house, which dust and dirt continually settled down in large quantities upon the furniture, books, food, clothing and other things in the house, to the great annoyance of the plaintiff, and so as to be destructive of the comfort and health of himself and his family and cause material injury to his possession, use and enjoyment of his home. Under the instructions of the court, the jury, upon the trial below, found the two Railroad Companies not guilty, and returned a verdict of guilty against the other defendants, the two appellants here. Judgment was entered upon the verdict. The Appellate Court has affirmed the judgment, and the case comes here by reason of a certificate of importance granted by that court.'' And we quote at page 285: ''The coal-shed is about 610 feet long, 28 feet high and from 54 to 56 feet wide, built of lumber with a stone foundation and a roof covered with tarred paper. It is open at the west end and on the south side, and has an open space on the north side between the siding and roof, so that the coal dust escapes upon the adjoining premises. Cars are switched from the railroad tracks into the shed upon a raised platform. The coal is thrown into an iron hopper by means of an iron scraper operated by steam power, and is then received into an iron conveyer run by steam, and lifted from 20 to 28 feet high and emptied into a chute or trough plated with iron, and conveyed through the same, and dumped upon the floor through openings in the chute. The shed will store 24,000 tons of coal. In June, 1888, from 15 to 23 car-loads of coal per day were delivered into it, each car-load holding from 12 to 20 tons; about 23 cars would be unloaded in one day. This process of lifting, conveying and dumping the coal by means of machinery from the top of the shed to the floor below, in large masses, causes the coal to break and grind upon coming in contact with the iron conveyer,

etc., and produces not only deafening noises, but clouds of coal dust. The evidence tends to show that the locality in question is in a thickly settled portion of the city, and that there are many houses and stores near plaintiff's residence on Jefferson street, and also south of Washington street, and east and west of the other streets above named. Many of the owners and occupants of these houses and stores were put upon the witness stand, and swore that they also were annoyed and injured by the noises and coal dust in question in the use and enjoyment of their respective properties." . . . "It is urged, however, by the appellants, that, by the testimony thus admitted, the nuisance was shown to have been a public one, and that a private action will not lie for injuries suffered from a public nuisance. Counsel for appellants thus state their position: 'the annoyance complained of by the plaintiff is only such as he in common with the public is subjected to, and, therefore, he cannot have a private action to redress his supposed injury.' "

The court affirmed a judgment recovered by the plaintiff in the trial court, and held that such recovery was justified, even though the nuisance was a public one and that other members of the public were similarly disturbed or affected. The opinion uses what we think rightly may be termed dicta that gives some support to the plaintiffs' contention in this case, but a careful reading of the case discloses at least three fundamental distinctions. (1) In the *Wylie* case there was an actual destruction of health and property from clouds of coal dust developed by the defendant's vast and extensive loading and unloading of coal. (2) The defendants located their large plant in a thickly populated residential area (nonindustrial). (3) Significantly, the court held that there could be no recovery if the defendant operated his plant in a "prudent, careful and proper manner." In other words, the coal dust was not found to be a necessary concomitant of

the industry. However, the proof 'in the case at bar shows conclusively that the smells and odors in question were necessary concomitants of the defendant's tannery. This case appears to be authority for our holding that it is proper to consider the proof offered by the defendant that its plant was operated properly, prudently, and according to recognized methods.

The court in the *Elwood* case quotes two Illinois cases, a consideration of which may furnish some enlightenment. The first, *Cooper v. Randall*, 59 Ill. 317, was an action for damages to plaintiff's premises arising from a flouring mill on a lot near such premises which threw upon them chaff, dust, dirt and other impurities. The second, *Illinois Cent. R. Co. v. Grabill*, 50 Ill. 241, was an action by the plaintiff to recover damages for the disturbance of her enjoyment of certain premises, caused by the negligent, careless, and improper manner in which the defendant kept and maintained a certain cattle pen. The evidence showed that the Illinois Central Railroad had erected a cattle pen near her premises in the heart of the city of Urbana, a quiet, university, nonindustrial center. The railroad was charged with leaving dead hogs and cattle lying in the pen to decay and rot until rotten and poisonous smells were generated. It was further charged that the defendant permitted foul and poisonous water to stand in the pen, thus causing noxious vapors to spread and to be deposited on the plaintiff's premises. Recovery was had in the lower court. The appellant, to reverse that judgment, made the contention that the railroad could not be held liable because it was following its legitimate and lawful business, and that the annoyances suffered by the plaintiff were only such as individuals are frequently obliged to suffer. The court in its opinion said, "There is no complaint in the declaration of annoyance by the running of engines, the escape of steam or otherwise, near her premises. Such consequences of the construction and

use of railroads must be borne by all living near them, without complaint and without hope of redress for they are inseparable from the purposes and objects of such structures." The court goes ahead to declare that recovery should be had for such damages as arise out of the careless and negligent acts of a railroad company in regard to any usual and necessary operation of its business. This early pronouncement of the law on the subject that confronts us recognized the principle that industry has its necessary concomitants which must be borne by the public "without complaint and without hope of redress."

Bearing in mind what has been held in the foregoing cases, and comparing the facts appearing therein with the record in this case, we do not feel justified in saying that they constitute authority for holding that the plaintiffs are entitled to recover.

A more helpful and pertinent and closely analogous line of cases is found in the defendant's brief, most of which are from foreign jurisdiction, namely; *City of Pana v. Central Washed Coal Co.*, 260 Ill. 111; *Strachan v. Beacon Oil Co.*, 251 Mass. 479, 146 N. E. 787; *Ebur v. Alloy Metal Wire Co.*, 304 Pa. 177, 155 Atl. 280, 282; *Prest v. Ross*, 245 Mass. 342, 139 N. E. 792; *Higgins v. Decorah Produce Co.*, 214 Iowa 276, 242 N. W. 109. The Supreme Court of Massachusetts, in *Strachan v. Beacon Oil Company, supra*, said, "It is a matter of common knowledge that in thickly settled manufacturing communities, the atmosphere is inevitably impregnated with disagreeable odors and impurities. This is one of the annoyances and inconveniences which everyone in such a neighborhood must endure." The same court said at page 789, "The defendant is engaged in a lawful business in the conduct of which it is found that odors necessarily will escape into the air; but it also appears that the defendant has adopted the most improved methods and devices to control and confine such odors. . . . It also is

further found that such odors would not be unbearable or injurious to the health of normal persons. . . . The district where the defendant's plant is situated has, for many years been increasingly developed to manufacturing purposes; some of the plants were there located many years ago and from some of them odors are thrown off at times which are offensive and disagreeable, but as those discharged by the defendant are not injurious to the lives or health of normal persons, it cannot be held that a nuisance exists . . . .''

Other holdings and principles announced in the cases cited above are that interference restraining normal industrial activities is contrary to public policy, and that the only protection that the public is entitled to is against unreasonable and unnecessary odors, noises and smoke. ''The term nuisance is applied to that class of wrongs which arise from the unreasonable, unwarrantable or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage.'' 39 Am. Jur. 280, sec. 2. These cases discuss principles applicable to the operation of business which unavoidably and reasonably discharge odors and scents. They consider the burdens necessarily incident to life in urban and industrial communities where the air is filled with unpleasant odors which are inevitable and unavoidable in the conduct of factories and industries in such a district, and are a necessary incident of life therein.

To permit the judgment to stand in this case and to countenance recovery in this class of cases, would expose the industrial world to litigation, the extent of which one's imagination toils in vain to comprehend. Conceive, if you can, the thousands of delicate stomachs and sensitive olfactory organs that would be grievously disturbed and offended by odors that are unavoidably induced by stockyards and chemical plants that abound in every metropolitan area.

Counsel for both plaintiffs and defendant have fav-. ored this court with ably prepared briefs and arguments. Occasionally they waxed a little literary and eloquent, for instance the plaintiff says, "The rich man in his mansion on the hill, could with the same intellectual honesty, say that he must abandon and destroy his home if he is not allowed to let his sewage run down the hill into the backyards of his poor neighbors who live in the valley." The defendant, not to be outdone says, "If plaintiffs are successful in this suit, not only will the defendant's plant have to suspend operations, but so will industrial plants all over this State. The hum of industry and the whir of busy wheels so vital at this time to our national defense and in repelling the unjust and treacherous attacks which have been made upon us and our liberty and institutions will cease, with consequences to this country too terrible to contemplate." It is needless to say that this argument is interesting if not helpful.

This court, therefore, in view of what has been observed in this opinion, holds that the judgment entered herein should be reversed and judgment entered here for the defendant in bar of action, and for costs.

*Reversed.*

MR. JUSTICE STONE dissenting: I am not in harmony with the majority opinion in this case, and, therefore, I feel called upon to dissent from said opinion.

In the majority opinion much time is given to the question of whether the verdicts are warranted by the evidence. To me that question is not now of importance. All such questions were submitted to the jury on enough evidence, it seems to me, to warrant the case going to the jury, and, therefore, those questions are decided and leave nothing but the one question as to whether the plaintiffs in these cases had a legal cause of action. We are all agreed that there is no reversi-

ble error in the record unless the court erred in not directing a verdict for the defendants.

The record discloses that the village of Hartford where the plaintiffs live and where the tannery and settling basin of the defendant is situated is an industrial village of approximately 1,600 people, located along the east bank of the Mississippi river. Plaintiffs were homeowners, living in the northeast outskirts of the village and in varying short distances from the sewage pond or settling basin complained of, which is several thousand feet from the tannery proper. Plaintiffs live between the basin and the tannery. The plant of defendant is used to process green hides into leather.

The settling basin is uncovered, and is 275 feet wide, 1,200 feet long and 5 feet deep. It was constructed in 1938, and into it is piped tannery waste and human waste. The complaint of plaintiffs was not directed at the operation of the tannery itself, but the settling basin, from which it was alleged that these unpleasant odors arose, whereby it is urged, on the part of plaintiffs, that a nuisance was created, interfering with the wholesome, healthful and ordinary enjoyment by plaintiffs of their property.

It is relied upon as error for the reversal of these judgments, that plaintiffs failed to plead or prove any cause of action at law, which would entitle them to a judgment for damages against defendant, and it is contended on behalf of defendant that because the evidence did not show any damage from the odor to the health of plaintiffs, and because of the fact that no smoke, soot, hides, hair or any substance of any kind was cast upon plaintiffs' premises, no action for damages can lie. It is also strenuously urged in that regard that private actions at law may not be maintained by a citizen against a person or corporation for the maintenance of a public nuisance unless he has shown

personal damage peculiar to himself which is different from that suffered by the general public.

To live comfortably is the chief and most reasonable object of men acquiring property and establishing homes for themselves and families and any interference in that comfortable enjoyment of life is a wrong which the law will redress. *Wahle v. Reinbach,* 76 Ill. 322; *Seacord v. People,* 22 Ill. App. 279; *Iliff v. School Directors,* 45 Ill. App. 419; *Cook v. City of Du Quoin,* 256 Ill. App. 452; *Wineland ex rel. Abeln v. M. Huber, Inc.,* 275 Ill. App. 264; *Feder v. Perry Coal Co.,* 279 Ill. App. 314; *Eckart v. City of Belleville,* 294 Ill. App. 144; *Menolascino v. Superior Felt & Bedding Co.,* 313 Ill. App. 557. Whatever is offensive, physically, to the senses, and by such offensiveness makes life uncomfortable, is a nuisance and any business, however lawful which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence is a nuisance. *Wahle v. Reinbach, supra; Seacord v. People, supra; Cooper v. Randall,* 53 Ill. 24. The creation of stenches and noisome odors has been recognized always as a nuisance. 46 C. J. 687. Following the rule laid down in the above cited cases, it was not necessary, in order for there to be a cause of action in favor of plaintiff, that there be an injury to health on their part, or that smoke, soot, hides, hair or any other substance be cast upon their premises. In the case of *Wahle v. Reinbach, supra,* the court adopting the language of a New Jersey case, *Cleveland v. Citizens Gaslight Co.,* 5 C. E. Greene (20 N. J. Eq. 201) page 205, said, "Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance, that should be restrained; and smoke, noise and bad odors, even when not injurious to health, may render a dwelling so uncomfortable as to drive from it any one not compelled by poverty to remain. Unpleasant odors, from the very constitution

of our nature, render us uncomfortable, and when continued or repeated, make life uncomfortable."

Plaintiffs herein had the natural right to have the air diffused over their premises reasonably free from noxious odors and other impurities, so as not to materially interfere with plaintiffs' use and enjoyment of their homes. *Cooper v. Randall*, *supra; Chicago-Virden Coal Co. v. Wilson,* 67 Ill. App. 443; *Matthiessen & Hegeler Zinc Co. v. Ferris,* 72 Ill. App. 684; *Feder v. Perry Coal Co.,* 279 Ill. App. 314.

The well considered opinion in the case of *Wylie v. Elwood,* 134 Ill. 281, seems to me to be conclusive on the question raised by defendant, as to the right of a citizen to maintain an action for damages resulting from a public nuisance, unless he shows personal damages peculiar to himself, which is different from that suffered by the general public. In that case, plaintiff, who was injured in the enjoyment of his home by the noise and dust growing out of the erection and maintenance of a large coal shed by defendant, was allowed a recovery. There the defendant, as here, contended that since the nuisance affected the public, plaintiff should not be permitted to maintain his action. The court, as to that proposition of law at page 287, said, "The doctrine, that special damage must be shown in order to justify a private action for injury growing out of a public nuisance, had its origin in the consideration of nuisances growing out of obstructions to highways and navigable streams. For instance, if a man dug a ditch across a public highway, the traveler would have no action for the inconvenience which he suffered from the interruption in common with the rest of the public, but, if his horse fell into the ditch and was killed, he would thereby suffer a special damage not common to others.

"The strictness of the original rule has been greatly modified since the days of Lord Coke. Recovery may be had for damages which are consequential as well

as direct (Wood's Law of Nuisances, Sec. 620 and 621). An individual who receives actual damage from a nuisance, may maintain a private suit for his own injury, although there may be many others in the same situation (*Lansing v. Smith*, 4 Wend. 10). The doctrine now is, that a nuisance may be at the same time both public and private. The use of a steam engine in a crowded street may be a public nuisance, but, in a case where the smoke from it also injured the goods in a man's shop and made his dwelling uncomfortable, it was held to be such a private nuisance as would give him a right of action (Idem. Sec. 649). In *Francis v. Schoellkopf*, 53 N. Y. 152, it was held that, although the stench from a tannery injured a large number of houses, yet the plaintiff, whose dwelling was made uncomfortable and almost uninhabitable, was entitled to sue for her particular injury."

In the case at bar, if the homes of the plaintiffs were rendered uncomfortable and unlivable by the noxious odors emitted from the settling basin of defendant, they suffered a special damage, even though the homes of their neighbors were rendered uncomfortable in varying degrees from the same cause. As was said in the case of *Francis v. Schoellkopf*, 53 N. Y. 152, where plaintiff sued for damages sustained from the stench of a tannery and a large number of other houses were rendered almost uninhabitable, "it is no defense for a wrong doer when called upon to compensate for damages sustained by his wrongful act to show that he, by the same act, inflicted a like injury upon numerous other persons."

And here now, may be disposed of, the claim of defendant that odors from other industries may have contributed to the discomfort and damage of plaintiffs. Where the acts of several persons, although separate and distinct as to time and place, culminate in producing a public nuisance, which injures the person or property of another, they are jointly and severally

liable. *Fox v. City of Joliet*, 150 Ill. App. 491; *Cook v. City of Du Quoin*, 256 Ill. App. 452. I am of the opinion that on the pleading and proof, plaintiffs established, prima facie, a legal cause of action.

It is contended by defendant that plaintiffs failed to prove that any discomforts which were suffered by plaintiff were the result of any unnecessary and unreasonable conduct on the part of defendant in the operation of its tannery and settling basin. Proceeding upon this theory, defendant offered to prove that the tannery was operated in accordance with the recognized method of the operation of a tannery and that such operation was consistent with the generally accepted method, to which objection was made, and objection sustained by the court. It has been held many times by our courts when damage is predicated upon nuisance and where no punitive damages are sought, the question of negligence is not involved. *Randall v. Cooper, supra; Laflin & Rand Powder Co. v. Tearney*, 131 Ill. 322; *Menolascino v. Superior Felt & Bedding Co., supra; Feder v. Perry Coal Co., supra.* The trial court did not err in the rejection of this testimony, as the question of the unnecessary and unreasonable conduct on the part of defendant was not an issue.

Defendant further offered in evidence testimony tending to show that there were other industries in and about East St. Louis, and between Hartford and East St. Louis, which gave off odors, and that these odors had a greater intensity and were less pleasant than odors in and about Hartford, and that the witness had observed that there were many people who had their houses there where such conditions prevailed. It was further offered to prove that the largest sole-leather tannery in the United States was located at Elkland, Pennsylvania, and that there were settling basins there and that the odor there was as bad or worse than it was at Hartford, and that many

residences were located there. This proferred evidence was clearly improper, irrelevant, and immaterial and only calculated to create a secondary and false issue, not involved in the trial of the cause, and the court did not err in refusing these witnesses to testify.

It is urged on behalf of defendant that the court erred in failing to direct the jury to return a verdict for defendant as to each count in the complaint; that the verdicts are against the manifest weight of the evidence and that the court erred in denying defendant's motion for a new trial. Eighteen witnesses, including plaintiffs, testified on behalf of plaintiffs. The substance of their testimony was to the effect that shortly after the establishment of the settling basin, foul odors began to emanate therefrom, that such odors continued from that time, until the filing of the suit and were always present at all times, of the day and night. This odor was variously described as being like, "fertilizer scraps," "decomposed animal, only worse," "foul and vile, like decomposed flesh," "something dead and decayed," "dead animal or packed fresh hides," "worse than rotten eggs and decayed flesh."

In the summer when the windows were up, it was worse than in the winter. It would awaken one from sleep, spoil appetites, and cause vomiting. Some witnesses described a burning sensation in their throats, and nausea when the stench was at its worst. It would be necessary to turn electric fans on to drive the smell from their homes. Freshly washed clothes would smell of it.

Twenty-four witnesses testified on behalf of defendant, the most of whom testified to the effect that there were other odors, other than those from the settling basin, prevalent in that community; that whether the odors from the settling basin were noticeable depended upon the wind direction and were worse when the humidity was high, and that the odor was somewhat similar to that of the tannery proper. The most of

them testified that they and their families had not been rendered uncomfortable by the odors. Milton R. Kronenberg, called on behalf of defendant testified that he was Chief of the Division of Industrial Hygiene of the Illinois State Department of Public Health, and a physician and surgeon, that under his supervision a study of the atmospheric conditions of Hartford and in the vicinity of the settling basin was conducted. He found, so he stated, that the odors from the basin were characteristic tannery odors, that were was nothing of a suffocating nature in the air, nothing to wake them up, or disturb their sleep; nothing that could or might objectively cause nausea. He further testified that tests were conducted by means of an instrument, and that his observations were not based upon his reactions from his nose but from the instrument used. To offset this more or less negative testimony, many witnesses testified positively that they were awakened by the smell, that it disturbed their sleep, and that they were nauseated, and had a feeling of suffocation.

It was the province of the jury, as the triers of fact to determine whether these odors complained of were attributable to the operation of the settling basin and whether they caused the damage complained of. 46 C. J. 813. They saw and heard the witnesses testify, and could weigh their credibility, their powers and opportunity for observing the matters about which they testified, and their interest, if any, in the result of the suit. Where a fair question of fact is raised by the proof, a court of review will not set aside the jury's finding as being against the manifest weight of the evidence. *Armster v. American Steel Foundries*, 313 Ill. App. 378, at 385; *Summers v. Hendricks*, 300 Ill. App. 498; *Jones v. Esenberg*, 229 Ill. App. 551; *Gregory v. Merriam*, 294 Ill. App. 483.

While it is the general rule that defendant has a right to use its property as it sees fit, still, if in doing

so, regardless of whether *it is negligent or not,* or *whether its factory is properly operated,* it creates and maintains a nuisance and thereby deprives neighbors of the use and enjoyment of their homes and injures their health, it is liable. *Menolascino v. Superior Felt & Bedding Co.,* 313 Ill. App. 557, 40 N. E. (2d) 813; *Francis v. Schoellkopf,* 53 N. Y. 152.

In *McFarlane v. City of Niagara Falls,* 247 N. Y. 340, Justice CARDOZO, in expounding the theory of nuisance, said, "Nuisance as a concept of law, has more meanings than one. The primary meaning does not involve the element of negligence as one of its essential factors. . . . One acts sometimes at one's peril. In such circumstances the duty to desist is absolute whenever conduct, if persisted in, brings damage to another . . . . Illustrations are abundant. One who emits noxious fumes or gases day by day in the running of his factory may be liable to his neighbor *though he has taken all available precautions . . . .* He is not to do such things at all, whether he is negligent or careful."

Also if a person keeps his hogs or other noisome animals, so near the house of another that the stench of them incommodes him and makes the air unwholesome, this is an injurious nuisance, as it tends to deprive him of the use and benefit of his house. 3 Blackstone 216.

Defendant, in the case of *Bohan v. Port Jervis Gaslight Co.,* 122 N. Y. 18, was engaged in the manufacture of gas and plaintiff owned the adjoining property. There the trial court instructed the jury that, to constitute a nuisance, it was essential that the smells and odors from defendant's works should be sufficient, "to contaminate and pollute the air, and substantially interfere with the plaintiff's enjoyment of her property," and that the question for them to determine was, "Did the odor pollute the air so as to substantially render plaintiff's property unfit for comfortable

enjoyment," to which the defendant excepted. There the court said: "The rule stated by the learned judge was in accordance with all the authorities. If one carry on a lawful trade or business in such a manner as to prove a nuisance to his neighbor, he must answer in damages, and it is not necessary to a right of action that the owner should be driven from his dwelling; it is enough that the enjoyment of life and property be rendered uncomfortable. . . .

"It may be confidently asserted that no authority can be produced holding that negligence is essential to establish a cause of action for injuries of such a character."

I am very strongly of the opinion that the trial court did not err in refusing to direct a verdict and that the judgment should be affirmed.

If the majority opinion is correct, then there *is* such a thing as a wrong without a remedy.